**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| TIM GARL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. |
| | ) |
| BOARD OF TRUSTEES OF | ) |
| INDIANA UNIVERSITY, and | ) |
| SCOTT DOLSON, individually. | ) |
| | ) |
| Defendants. | |

**TIM GARL'S COMPLAINT FOR DAMAGES FOR**
**WRONGFUL TERMINATION/AGE DISCRIMINATION,**
**VIOLATION OF EQUAL PROTECTION AND OTHER DAMAGES**

Tim Garl, for his Complaint against the Board of Trustees of Indiana University

("IU") and IU's Vice President and Director of Intercollegiate Athletics, Scott Dolson

("Mr. Dolson") alleges as follows:

**Introduction**

1.    This action addresses the wrongful termination and age discrimination of

Mr. Garl by IU on March 31, 2025. For forty-four years, Mr. Garl served with distinction

as the IU Head Men's Basketball Trainer ("Head Trainer"), as well as other administrative

roles within IU's Men's Basketball ("IUMB").

2.    During this time, Mr. Garl received numerous professional accolades and

certifications. This includes 25 years of service on the United States Olympic Committee's

("USOC") Sports Medicine Committee, as its longest ever serving member and its Vice

Chair, as well as serving as the Chairman of the USOC Medicine Society. Mr. Garl also

continues to serve as a board member of the College Athletic Trainer Society, which oversees and governs the ethical conduct of collegiate athletic trainers, and how to best practice the profession of collegiate athletic training.

3. Mr. Garl served IU with distinction and universal acclaim for seven different IUMB head coaches , always being retained despite other staff changes because he is widely considered to be amongst the very best athletic trainers for men's basketball in the county.

4. Mr. Garl remains one of the most respected athletic trainers in the country.

5. Despite all of this, IU fired Mr. Garl on March 31, 2025. It **admits** that it did so because of his age.

6. That, of course, violates the Age Discrimination in Employment Act ("ADEA") and the Fourteenth Amendment.

7. In addition, in January 2025, Mr. Garl was named as a co-defendant with IU in a lawsuit filed in this Court, regarding allegations of misconduct at IUMB (the "IUMB Lawsuit").

8. Despite having a statutory obligation to defend and indemnify Mr. Garl as a public employee related to the IUMB Lawsuit, IU refused to do so until August 2025.

9. IU continues to shirk its obligations by failing to fully pay the reasonable attorneys' fees Mr. Garl incurred to defend himself.

10. Mr. Garl brings this action to recover the damages that IU deliberately inflicted on one of its longest-serving and most celebrated employees in its history.

**Parties, Jurisdiction, and Venue**

11.    Mr. Garl is a citizen of Indiana, a resident of Monroe County, and over the age of 40.

12.    IU is a non-profit institution incorporated in Indiana with its principal place of business in Monroe County, Indiana.

13.    Mr. Dolson is an employee of IU and a citizen of Indiana.

14.    This Court has original jurisdiction of this case as it has federal question jurisdiction for Mr. Garl's claims under the ADEA and the Fourteenth Amendment. *See* 28 U.S.C. §1331.

15.    This Court has supplemental jurisdiction over Mr. Garl's claims for indemnification and restitution under Indiana law. *See* 28 U.S.C. §1367.

16.    On July 30, 2026, the Equal Employment Opportunity Commission provided Mr. Garl with notice of his right to sue IU in federal or state court within ninety (90) days.

**Mr. Garl's Career Prior to IU**

17.    Mr. Garl received his undergraduate degree at the University of Alabama, where he also spent four years working as a student athletic trainer for the legendary Alabama football coach Paul "Bear" Bryant, as was part of two SEC football championships.

18.    Following this, Mr. Garl spent three years (1979-1981) at the University of Mississippi, working as an assistant athletic trainer working across several sports,

including basketball, where he was part of the 1980 SEC Men's Basketball Championship team. During this time Mr. Garl also earned a master's degree in administration.

19. In 1979, Mr. Garl began working with USOC's Sports Medicine Committee, a relationship that would continue for 25 years and included playing a lead role in creating the first policy statement to address how to handle HIV/AIDS in competitive sports. This policy statement not only served as the basis for several U.S. states' legislation to address this issue, but also was adopted by the United States Army, which sent Mr. Garl to military bases around the world to educate Army officers on how to implement these recommendations.

### Mr. Garl's Career at IU

20. On the basis of his strong performances at the University of Alabama, University of Mississippi, and the USOC, Mr. Garl (an Elkhart, Indiana native) was hired by legendary IUMB Coach Bobby Knight in 1981—a decision that laid the groundwork for more than four decades of dedicated service to IUMB and IU.

21. Mr. Garl's hiring was part of Coach Knight's commitment to completely revolutionizing the approach to sports science and sports medicine for IUMB, along with others like Dr. Larry Rink.

22. Mr. Garl became an indispensable member of Coach Knight's staff, helping to maintain the high standards expected of IUMB.

23. Due to his expertise and experience, Mr. Garl continued in this role under the next five IUMB head coaches (Mike Davis, Kelvin Sampson, Tom Crean, Archie Miller, and Mike Woodson).

24. Mr. Garl was also a member of the USOC's basketball operations until 2007.

25. Those who worked alongside Mr. Garl routinely praise his dedication to his craft and to his athletes.

**IU Wrongfully Terminates Mr. Garl**

26. On March 26, 2025, Mr. Garl met with Mr. Dolson in the office of Kristen Pieper, IU's Senior Associate Athletic Director for Human Resources ("Ms. Pieper").

27. During this meeting, Mr. Dolson informed Mr. Garl that IU would be terminating Mr. Garl's employment effective March 31, 2025, because IU wanted a "fresh start" in his position.

28. This was shocking news to Mr. Garl, not only because of his long and decorated service to both IU and IUMB, but also because Mr. Garl had been in discussions with the new head coach (the pretextual reason for a "fresh start"), Darian DeVries, regarding his role on Coach DeVries' staff.

29. Mr. Garl had even been working with Coach DeVries regarding an offseason training and recovery plan for incoming players.

30. Mr. Garl was not offered any explanation for this sudden decision but was simply told he would need to clean out his office within the week.

31. IU also attempted to have Mr. Garl sign a release, which purported to waive any claims he may have had against IU related to his employment.

32. This sudden change and pretextual "fresh start" language appears to be the final step in sustained and systemic campaign of intimidation and harassment, designed to force Mr. Garl (then 68 and now 69) out to replace him with a younger, less

experienced, less respected, and cheaper Head Trainer, and to retaliate for his refusal to take actions that violated state/federal law, NCAA rules, and medical ethics (and that would have exposed him to personal liability).

<strong><u>EEOC Proceeding and Contradictory Documentation</u></strong>

33. Because of these actions by IU and its agents, Mr. Garl filed a Charge of Discrimination with the EEOC and ICRC on or about September 29, 2025.

34. On February 13, 2026, IU responded to that Charge of Discrimination, claiming that Mr. Garl's termination was the result of "deficiencies" in Mr. Garl's performance. Attached hereto as <u>Exhibit A</u> is a true and accurate copy of IU's Response.

35. Notably, that is not the rationale Mr. Dolson gave for firing Mr. Garl.

36. Moreover, IU did not attach any documentation of these alleged deficiencies.

37. Indeed, Mr. Garl never received any documentation regarding alleged deficiencies. *See e.g.,* Ex. A.

38. This lack of evidence demonstrates that these claims by IU are demonstrably false, particularly in light of the evidence that already exists.

39. First, in a deposition, Scott Dolson, IU's Vice President and Director of Intercollegiate Athletics (and the individual who made the decision to sever Mr. Garl's employment), provided sworn testimony for why IU fired Mr. Garl. Attached hereto as <u>Exhibit B</u> is a true and accurate copy of the relevant portion of the Deposition Transcript of Scott Dolson.

40.     Mr. Dolson does not mention any of the purported deficiencies that IU now says motivated its decision to fire Mr. Garl.

41.     Instead, Mr. Dolson's sworn testimony echoed what Mr. Garl's Charge claimed, that Mr. Garl was considering retirement and Mr. Dolson wanted a "fresh start." *Id.* at 124-125.

42.     As such, Mr. Dolson has already admitted that it was *he* who decided that it was time for Mr. Garl to retire. *Id.*

43.     This is age discrimination *per se.*

44.     Further, IU replaced Mr. Garl with Andrew Vereen, an individual who is significantly younger than Mr. Garl, has less than a quarter of the experience of Mr. Garl and, of course could be paid less than Mr. Garl. *See* https://iuhoosiers.com/sports/mens-basketball/roster/coaches/andrew-vereen/4255.

45.     Second, IU's Response claims that "during Coach Woodson's tenure, [IU] began to notice several deficiencies in Garl's performance" of his duties. Ex. A at 2.

46.     Coach Woodson, however, wrote in a signed letter that "during my time as head coach for Men's Basketball at [IU], I gave Tim Garl superior performance evaluations," and "any suggestion that he is not at the top of the Athletic Training Profession is completely wrong." A true and accurate copy of Coach Woodson's letter is attached hereto as Exhibit C.

47.     Coach Woodson also wrote that Mr. Garl's "skills, passion of care and professionalism are comparable to those top professionals I have encountered" across his 50-year career. *See* Ex. C.

48.    Mr. Garl's high level of professionalism, knowledge, and skill are echoed by countless others involved with IU and IUMB, including (but not limited to):

a.    Cliff Marshall, IU Men's Basketball's Former Director of Athletic Performance (2017-2024), stated in a signed letter, a true and accurate copy of which is attached hereto as Exhibit D, that Mr. Garl:

i.    Provided "the highest standard of medical care;"

ii.    "Understood the importance of data, recovery monitoring, and evidence-based treatment" in addition to "traditional athletic training;"

iii.    Would "go above and beyond the responsibilities of the role;"

iv.    "Operates at a professional standard that aligns with the expectations of high-performance environments."

b.    Robert Black, IU's Women's Basketball Trainer, who shared training facilities with Mr. Garl between April 2010 through June 2022, stated in a signed letter, a true and accurate copy of which is attached hereto as Exhibit E, that:

i.    Mr. Garl "[a]lways" had "student-athletes" as his "top priority;"

ii.    Mr. Garl "[r]egularly consulted literature reviews, colleagues, and surgical protocols to seek updated information for specialized or alternative care" on a "daily" basis;

iii.    Mr. Garl had a "knowledge and skill within the basketball community [that] are unparalleled;" and

8

iv.  Mr. Black was not aware of any deficiencies that could be leveled regarding Mr. Garl's actions or skills.

c.  Dr. Larry Rink, who spent forty years as a team physician for IU Men's Basketball, worked closely with Mr. Garl over those four decades, and has the direct clinical experience required to evaluate Mr. Garl's capabilities and skillset, as well as experience with other physicians who have worked with Mr. Garl, stated in a signed letter, a true and accurate copy of which is attached hereto as Exhibit F, that:

i.  Mr. Garl stood by his medical ethics even under pressure of IU to change a medical record;

ii.  Mr. Garl "[c]onsistently placed athletes' welfare above all other considerations and maintained a level of commitment that is increasingly rare in modern athletics;"

iii.  Mr. Garl has "exceptional expertise, judgment, and professional reputation;"

iv.  Mr. Garl was "highly knowledgeable and consistently engaged in continuing education;"

v.  Mr. Garl had a direct communication style that should be admired in his profession;

vi.  Any "difficulties and interpersonal reactions and documentation practices" are "hearsay concerns [that] do not align with the individual I have worked with for decades;" and

9

vii. That it is concerning that Dr. Rink's own retirement timing motivated Mr. Dolson's decision to "retire" Mr. Garl.

d. A group of former IUMB players including James Blackmon, Luke Goode, Calbert Cheaney, Jared Jeffries, Yogi Ferrell, Cody Zeller, Joey Brunk, Nick Zeisloft, Devonte Green, Josh Newkirk, Rob Phinisee, Jalen Hood Schifino, Justin Smith, Robert Johnson, Trayce Jackson-Davis, Trey Galloway, and Mike Roberts stated in a signed letter, a true and accurate copy of which is attached hereto as Exhibit G, that the care given by Mr. Garl was as good or better than any care they received in the NBA (National Basketball Association).

e. Tom Izzo, the winningest coach in Big Ten Men's Basketball history, who has known Mr. Garl for more than forty years, personally attested to Mr. Garl's "professionalism, skill level, and genuine care for what's best for student-athletes." A true and accurate copy of Coach Izzo's letter is attached hereto as Exhibit H,

49. Third, IU's claims that Mr. Garl "refused" to share information regarding a player's injury with IU's Sports Information Director similarly holds no weight and shows a lack of understanding by the IU Athletic Department of the legal and ethical requirements to protect information related to a player's health.

50. This information not only is confidential medical information subject to the Health Insurance Portability and Accountability Act, by which Mr. Garl is bound, but

10

also is information that must be tightly controlled for integrity of competition in light of the legalization and growth of sports gambling.

51. In fact, the Big Ten has specific rules regarding how such information can be reported and must be protected due to the potential effects on gambling markets.

52. Each of the Head Basketball Coaches, Dr. Larry Rink and the Athletic Director all agreed that this information should be tightly controlled and was communicated on a "need to know" basis.

53. Any suggestion that Mr. Garl should have shared a player's protected health information with the Sports Information Director demonstrates ignorance by IU Athletics' Chief Medical Officer, Dr. Mike LaGrange, and others at IU of these policies. Additionally, when IU's Sports Information personnel did need to report information regarding player availability in compliance with Big Ten rules, they collaborated with, and relied on, Mr. Garl to help them properly word the release of any such information.

54. Fourth, it appears that IU is relying upon the word of Dr. LaGrange regarding Mr. Garl's performance, however, Dr. LaGrange's statements are called into the question by the following:

    a. Dr. LaGrange did not visit the IU Men's Basketball Training Room at Cook Hall a single time to evaluate Mr. Garl's performance.

    b. Dr. LaGrange attempted several times to pressure his subordinate, Mr. Garl, to change a medical record regarding a specific IU player.

    c. Dr. LaGrange also attempted to pressure Dr. Rink into changing the medical record, and Dr. Rink similarly refused to make the change.

11

55. Not least because changing a medical record would be grounds for professional disciplinary sanctions against healthcare professionals like Mr. Garl and Dr. Rink, may also constitute a Level 6 Felony under Ind. Code 16-28-9-4, and 18 U.S.C. 1035 provides that the altering of medical records may also constitute a standalone federal crime with a penalty of up to 5 years in prison, Mr. Garl and Dr. Rink properly resisted these requests by Dr. LaGrange.

56. Unfortunately, it appears that Dr. LaGrange has not respected this and assisted IU in its wrongful treatment of Mr. Garl in retaliation.

### The IUMB Lawsuit

57. On October 15, 2024, a group of former IUMB players filed the IUMB Lawsuit as a proposed class action in this Court, styled as *Haris Mujezinovic Et Al v. Trustees of Indiana University*, Case No. 1:24-cv-1827 (S.D. Ind).

58. The IUMB Lawsuit asserted a plethora of alleged misconduct that occurred several decades ago.

59. All of the allegations against Mr. Garl related to alleged misconduct in Mr. Garl's role with IUMB as Head Trainer.

60. The amended complaint asserted claims against Mr. Garl for alleged violation of the former IUMB players' civil rights.

61. On April 7, 2025, the former IUMB players filed a second amended complaint, which added tort claims against Mr. Garl in the IUMB Lawsuit.

62. Mr. Garl was not originally a defendant in the IUMB Lawsuit, but on January 14, 2025, an amended complaint was filed in the IUMB lawsuit, which named

Mr. Garl as a co-defendant in both his official capacity, and alternatively, in his personal capacity.

63.     Because of the multiple-decade delay in bringing these claims, this Court dismissed all the IUMB Lawsuit's federal claims with prejudice on March 31, 2026.

64.     That dismissal with prejudice is currently on appeal.

65.     Relatedly, the former IUMB players have filed a separate lawsuit in Monroe County, Indiana to assert their state law claims against IU.

66.     Mr. Garl is not a defendant in that case.

### Mr. Garl Seeks His Right to Defense and Indemnification by IU

67.     On January 20, 2025, undersigned counsel for Mr. Garl contacted then-Vice President and General Counsel of IU, Anthony Prather, seeking indemnification and payment of Mr. Garl's defense costs.

68.     Though Mr. Garl has a statutory right to indemnification separate from any policy adopted by IU, Counsel for Mr. Garl did this pursuant to IU's February 14, 2014, Resolution (the "Resolution") regarding the indemnification of individuals affiliated in an official capacity with IU, which directed that such requests be provided to the IU General Counsel.

69.     On January 22, 2025, although Mr. Prather agreed to undersigned counsel's representation of Mr. Garl, Mr. Prather refused to indemnify Mr. Garl, or pay his reasonable defense costs, unless Mr. Garl agreed to certain limitations and conditions on this indemnification.

70.     The conditional limitations that Mr. Prather and IU sought to impose violated Mr. Garl's statutory right to indemnification and the payment of all costs and fees incurred by him related to the IUMB Lawsuit under two separate Indiana statutes.

## Count I: Violation of 29 U.S.C. § 623
### (As to Defendant IU)

71.     Mr. Garl incorporates by reference all of the foregoing allegations as though fully restated herein.

72.     At all relevant times, Mr. Garl was in the class of individuals protected by the ADEA.

73.     The standard of whether improper discrimination occurred under the ADEA is "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected status] caused the discharge or other adverse employment action." *See Ortiz v. Werner Enters.*, Inc., 834 F.3d 760, 765 (7th Cir. 2016).

74.     Mr. Dolson has admitted that, because he knew Mr. Garl was close to retiring, he decided it was time for a "fresh start."

75.     As such, IU knowingly and willfully discriminated against Mr. Garl on the basis of his age.

76.     "Thus, it is not necessary for [Mr. Garl] to identify another class of individuals who were treated more favorably." *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 496 F. Supp. 3d 1195, 1207 (S.D. Ind. 2020).

77.     The ADEA's provisions apply even in the case of declining to renew a term-based contract employe like Mr. Garl. *Id.*

14

78.     IU unlawfully damaged Mr. Garl through these actions, depriving him of his employment, and harming his reputation in the community.

79.     As such, Mr. Garl seeks all relief to which he is entitled under the ADEA, including but not limited to (a) an order forbidding IU from deciding to retire protected employees of their own accord, (b) ordering Mr. Garl's reinstatement, and (c) reasonable costs and attorneys' fees.

### Count II: Violation of the Fourteenth Amendment – (42 U.S.C. § 1983)
### (As to Defendant Scott Dolson)

80.     Mr. Garl incorporates by reference all of the foregoing allegations though fully restated herein.

81.     This claim is brought pursuant to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

82.     Plaintiffs may file age discrimination claims simultaneously under the ADEA and the Fourteenth Amendment (pursuant to 42 U.S.C. § 1983). *See Levin v. Madigan*, 692 F.3d 607, 622 (7th Cir. 2012).

83.     At all times herein, defendant Scott Dolson, Individually, acted under color of law, statutes, customs, and ordinances of Indiana as an employee of IU, an instrumentality of the state of Indiana.

84.     On or about March 26, 2025, Mr. Dolson fired Mr. Garl, stating that IUMB needed a "fresh start."

85.     On or about March 26, 2025, Mr. Dolson knowingly failed to terminate similarly situated employees whose work performance was inferior to Mr. Garl's and

15

intentionally and knowingly treated Mr. Garl differently from similarly situated employees substantially younger than Mr. Garl.

86.    On or about July 28, 2025, Mr. Dolson admitted that Mr. Garl's termination was knowingly and willfully based on the fact that Mr. Garl was approaching retirement age.

87.    Therefore, Mr. Garl's age was the motivating factor Mr. Dolson's decision to fire Mr. Garl.

88.    Mr. Garl's record shows that he was an exemplary employee.

89.    Only after Mr. Garl complained of his wrongful termination did IU attempt to manufacture an excuse—which was not the reason Mr. Dolson identified under oath as the reason for Mr. Garl's termination.

90.    Mr. Dolson knowingly replaced Mr. Garl with Mr. Vereen, an individual who is significantly younger than Mr. Garl, has less than a quarter of the experience of Mr. Garl, and, of course, can be paid less than Mr. Garl.

91.    This conduct shows that Mr. Dolson knowingly and intentionally terminated Mr. Garl's employment based on the impermissible considerations of age, in violation of the Equal Protection Clause.

92.    Mr. Dolson maliciously and intentionally engaged in the above discriminatory conduct, which caused Mr. Garl severe emotional distress.

93.    As a result of Mr. Dolson's intentional discriminatory conduct above, Mr. Garl lost his job, suffered lost wages, lost income, lost employment benefits of the State

of Indiana, lost insurance benefits, and his ability to pursue his career free from discrimination on the basis of his age.

94.     As a further result of defendants' intentional discriminatory conduct, Mr. Garl has suffered and continues to suffer great emotional stress and strain, humiliation, loss of dignity, embarrassment, and loss of reputation.

95.     As such, Mr. Garl is entitled to seek and does seek (a) reinstatement, (b) front pay, (c) future damages, (d) other appropriate monetary damages, (e) attorneys' fees and costs, and (f) all other appropriate relief.

**Count III: Violation of Indiana Code § 34-13-3-5**
**(As to Defendant IU)**

96.     Mr. Garl incorporates by reference all of the foregoing allegations as though fully restated herein.

97.     Ind. Code § 34-13-3-5 requires that IU "shall provide counsel for *and pay all costs and fees incurred by or on behalf of an employee* in defense of a claim or suit for a loss occurring because of acts or omissions within the scope of the employee's employment, regardless of whether the employee can or cannot be held personally liable for the loss." (emphasis added).

98.     Because the IUMB Lawsuit alleged that the only alleged acts or omissions by Mr. Garl were in his capacity as IUMB's Head Trainer, Mr. Garl was entitled, under Ind. Code § 34-13-3-5, to full indemnification and payment of "all costs and fees" he incurred.

99.    IU has repeatedly refused to pay all costs and fees incurred by Mr. Garl, despite IU being provided timely notice of the lawsuit against Mr. Garl and consenting to undersigned counsel's representation of Mr. Garl related to the IUMB Lawsuit.

100.    This conduct breaches Ind. Code § 34-13-3-5 and entitles Mr. Garl to the recovery of all unpaid costs and fees he has incurred, as well as attorneys' fees and costs incurred in pursuing the recovery of these fees.

### Count IV: Violation of Indiana Code § 34-13-4-1
### (As to Defendant IU)

101.    Mr. Garl incorporates by reference all of the foregoing allegations as though fully restated herein.

102.    Under Ind. Code § 34-13-4-1, IU "shall … pay all costs and fees incurred by or on behalf of a public employee in defense of the claim or suit" for "any loss occurring because of a noncriminal act or omission within the scope of the public employee's employment which violates the civil rights laws of the United States."

103.    Because the IUMB Lawsuit alleged (a) that Mr. Garl violated the former IUMB players' civil rights, (b) that the only alleged acts or omissions by Mr. Garl were in his capacity as IUMB's Head Trainer, and (c) no criminal actions by Mr. Garl, Mr. Garl is entitled under Ind. Code § 34-13-4-1 to full indemnification and payment of "all costs and fees" he incurred.

104.    The Seventh Circuit has confirmed that "[i]f the employee was acting within the scope of his employment at the relevant time, he has a valid claim for reimbursement of his defense costs." *Robinett v. City of Indianapolis*, 894 F.3d 876, 880 (7th Cir. 2018).

105.    Even though IU has agreed since August 2025 that Mr. Garl committed no bad acts and was acting within the scope of his employment, IU has refused to pay "all" of the costs and fees incurred by Mr. Garl.

106.    This conduct breaches Ind. Code § 34-13-4-1 and entitles Mr. Garl to the recovery of all unpaid costs and fees he has incurred, as well as attorneys' fees and costs incurred in pursuing the recovery of these fees.

### **Prayer for Relief**

WHEREFORE, Plaintiff, Tim Garl, requests that the Court enter an Order:

A.    Prohibiting the Board of Trustees of Indiana University from violating the Age Discrimination in Employment Act;

B.    Ordering the Board of Trustees of Indiana University to reinstate Mr. Garl;

C.    Ordering the Board of Trustees of Indiana University to pay the full defense costs and attorneys' fees related to the IUMB Lawsuit that Tim Garl is owed under Indiana Code § 34-13-3-5 and Indiana Code § 34-13-4-1; and

D.    Awarding Tim Garl:

i.    Compensatory monetary damages against Scott Dolson (pursuant to 42 U.S.C. § 1983) for an amount to be determined at trial for:

(1)    Lost wages;

(2)    Lost income;

(3)    Lost employment benefits;

(4)    Lost insurance benefits;

19

(5)    Emotional stress and strain;

(6)    Anxiety; and

(7)    Loss of enjoyment of life;

ii.    Punitive monetary damages against Scott Dolson (pursuant to 42 U.S.C. § 1983) for his malicious and egregious violation of Tim Garl's rights under the Equal Protection Clause;

iii.    Attorneys' fees and costs owed under the Age Discrimination in Employment Act, Indiana Code § 34-13-3-5, Indiana Code § 34-13-4-1, and 42 U.S.C. § 1983 incurred in this action; and

E.    Granting Tim Garl all other just and proper relief.

## Jury Demand

Tim Garl demands trial by jury on all issues so triable.

Dated: August 11, 2026

Respectfully submitted,

*/s/ Christopher D. Lee*

Christopher D. Lee
Daniel R. Kelley
Andrew D. Dettmer
DINSMORE & SHOHL LLP
211 N. Pennsylvania Street
One Indiana Square, Suite 1800
Indianapolis, IN 46204
T.      (317) 639-6151
F.      (317) 639-6444

Christopher.Lee@Dinsmore.com
Daniel.Kelley@Dinsmore.com
Andrew.Dettmer@Dinsmore.com

*Counsel for Plaintiff Tim Garl*

20